UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

A.S.W., a minor child, by and    )
through his next friend,         )
Jeffery Whaley,                  )
                                 )
            Plaintiff,           )
                                 )
      v.                         )    No.  4:06CV1276 ERW
                                 )              (FRB)
MICHAEL J. ASTRUE,[1]            )
Commissioner of Social Security, )
                                 )
            Defendant.           )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is before the Court on plaintiff's appeal of an adverse ruling of the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural History**

On January 22, 2004, plaintiff Jeffery Whaley filed an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., on behalf of his fourteen-year-old son, A.S.W., in which plaintiff claimed that A.S.W. became disabled on March 1, 1993. (Tr. 50-53.)

---

[1]Michael J. Astrue became Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted, therefore, for Former Commissioner Jo Anne B. Barnhart as defendant in this cause.

On initial consideration, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 24-28.) On June 29, 2005, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 795-853.) A.S.W. testified and was represented by counsel. A.S.W.'s mother also testified at the hearing. On February 13, 2006, the ALJ issued a decision denying plaintiff's claim for benefits. (Tr. 9-18.) On July 21, 2006, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 5-7.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Testimony of A.S.W.</u>

At the hearing on June 29, 2005, A.S.W. testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, A.S.W. was sixteen years of age. A.S.W. testified that he was going into the eleventh grade and that he had never flunked any grade in school. (Tr. 803.) A.S.W. testified that he participated in "PRIDE" class which assisted him with his homework and helped him to complete it on time. (Tr. 803-04.) A.S.W. testified that during the previous year, he attended homebound school at Cottonwood Treatment Center, a residential facility for children with issues such as anger management. (Tr. 804.)

A.S.W. testified that he has been diagnosed with

- 2 -

Oppositional Defiant Disorder (ODD), Attention Deficit Hyperactivity Disorder (ADHD), Bipolar Disorder, and Depression. (Tr. 804-05.) A.S.W. testified that his conditions cause him to become hyperactive when he tries to make friends at school and that he gets bullied on account of it. (Tr. 805-06.) A.S.W. testified that his cousin's friends helped him with the bullies. (Tr. 815.) A.S.W. testified that he had no friends at school and that he had threatened children at school in response to being threatened himself. (Tr. 805-06.) A.S.W. testified that he had been disciplined at school on account of this behavior. (Tr. 806.) A.S.W. testified that the counselors at Cottonwood helped him to formulate a plan to make friends during the upcoming school year. (Tr. 825.)

A.S.W. testified that he has problems at home with his family. (Tr. 806, 826.) A.S.W. testified that his parents argue a lot and threaten that they will divorce. A.S.W. testified that he believes that he is the cause of his parents' problems. (Tr. 826.)

With respect to physical aggression, A.S.W. testified that while in the third grade, he kicked his sister in the stomach because she made him mad. (Tr. 833-34.) A.S.W. testified that while in the fourth grade, he threatened to drop a television on himself in an attempt to commit suicide as a result of arguing with his parents. A.S.W. testified that his father was able to catch the television before it landed on him. (Tr. 829-30.) A.S.W.

testified that he was committed to Spirit of St. Louis Hospital for a four-month period as a result of this behavior. (Tr. 813.) A.S.W. testified that upon being discharged from Spirit of St. Louis, he felt as though he was going to hurt someone so he asked that he be placed somewhere else. A.S.W. testified that he was then admitted to a treatment center at St. Anthony's for one week. (Tr. 814.)

A.S.W. testified that while in the seventh grade, he threatened to drop a couch on himself in an attempt to commit suicide as a result of arguing with his parents. (Tr. 829-30.) A.S.W. also testified that he wanted to punch his hand through a window but punched a wall instead as a result of his father calling him a "pansy ass." (Tr. 831.) A.S.W. testified that while in the eighth grade, he was placed in foster care after his father threatened to kill him. (Tr. 832.) A.S.W. testified that he was allowed to visit his home while in such care and that on one occasion he threatened his father with a knife. (Tr. 806, 832-33.) A.S.W. also testified that he once threw a handheld, electronic football game at his mother, hitting her in the stomach, but that he intended his action to be a joke and not an attempt to injure her. (Tr. 831-32.)

A.S.W. testified that he does not trust himself, doubts himself and sometimes thinks that he is a bad person because he does not do anything right. (Tr. 814-15.) A.S.W. testified that

he acts impulsively and has punched walls, thrown himself against walls and has thrown objects at walls, causing damage. A.S.W. also testified that he has kicked and damaged doors. A.S.W. testified that his father is afraid to leave him alone with his mother, because he is afraid that A.S.W. will hurt her. (Tr. 816-17.) A.S.W. testified that he has hurt his mother in the past because he did not get his way. (Tr. 817.)

A.S.W. testified that the police and juvenile authorities had been contacted on account of his behavior and that he was admitted to Cottonwood Treatment Center for a period of seven months. A.S.W. testified that he had just been discharged from Cottonwood (the date of the hearing), but that his discharge was nearly cancelled due to his behavior, in that he had pulled his mother's cane from under her because she was not listening to him. (Tr. 807.)

A.S.W. testified that he no longer has friends who come to his house and that he has had no friends his same age for about four or five years. (Tr. 808.) A.S.W. testified that he sometimes gets along with his cousins and that he spends time with two of his mother's close friends. (Tr. 835-36.) A.S.W. testified that he sometimes initiates trouble at school by annoying his peers with disruptive behavior such as talking a lot. A.S.W. testified that his behavior causes him to get into trouble with most of his teachers, but that his ninth grade science teacher helped him.

(Tr. 808-09, 822.) A.S.W. testified that not having friends has caused him to feel depressed. A.S.W. also testified that he has engaged in self-injurious behavior in the past as a result of fighting with his parents, such as dropping furniture on himself in attempts to commit suicide. (Tr. 812-13, 829-30.)

A.S.W. testified that he had refused to do some of his homework because he did not understand it, thought it was too hard, or did not receive help with it. (Tr. 823-24.) A.S.W. testified that he was evaluated to see if he could receive an Individualized Education Plan (IEP) or special services, but that he was too smart to receive such help. (Tr. 824.) A.S.W. testified that his grades range from B's to F's and that prior to entering Cottonwood, he was flunking English. (Tr. 809, 824.)

A.S.W. testified that he forgets things such as turning in his homework on time, and that he had such problems at Cottonwood even though it was a structured environment. (Tr. 809-10.) A.S.W. testified that he argued a lot with his counselors at Cottonwood and was punished by being sent to his room or by "losing points" for himself and his group. A.S.W. testified that he fought with other children at Cottonwood and that he was prevented from going home on break because of it. (Tr. 810.) A.S.W. testified that he was returning to Ste. Genevieve High School in the fall. (Tr. 811.)

A.S.W. testified that his ADHD causes him to get very

nervous if he sits for too long. (Tr. 817.) A.S.W. testified that his Bipolar Disorder causes him to experience mood swings on a daily basis and that he takes medication. (Tr. 817-18.) A.S.W. testified that he is tired of taking medication because he has been taking medication since he was four years of age. (Tr. 818.) A.S.W. testified, however, that he understands that his medication helps him. (Tr. 819.) A.S.W. testified that he attends group counseling sessions with other kids at the Community Counseling Center once a month where he talks with therapists and case managers. (Tr. 827.) A.S.W. testified that such counseling helps him. (Tr. 827-28.)

A.S.W. testified that he also experiences migraine headaches and sometimes has them every day. A.S.W. testified that the headaches increase in frequency when he is under stress. A.S.W. testified that during such headache episodes, he "can't stand life" and wants to lie down. A.S.W. testified that he sees the school nurse quite often because of his headaches. A.S.W. testified that he takes prescription medication for the headaches. (Tr. 819-20.)

A.S.W. testified that his mother must remind him to bathe and take care of himself. A.S.W. testified that he stays up late and becomes too tired to shower. A.S.W. testified that he did not have such difficulty at Cottonwood because of the schedule imposed. (Tr. 821.)

B.    Testimony of A.S.W.'s Mother

Theresa Whaley, A.S.W.'s mother, testified at the hearing in response to questions posed by the ALJ and counsel.

Mrs. Whaley testified that A.S.W. was sent to Cottonwood because of his issues at home, including destroying property and threatening her and Mr. Whaley.  Mrs. Whaley testified that A.S.W. was sent to Cottonwood rather than juvenile authorities.  (Tr. 838-39.)  Mrs. Whaley testified that A.S.W. has thrown things at her and has hit her on several occasions.  (Tr. 839.)  Mrs. Whaley testified that A.S.W. has been struck by his father and that A.S.W. threatened his father with a knife saying that that was the only way to protect himself, although Mr. Whaley was not near A.S.W. at the time.  Mrs. Whaley testified that both she and Mr. Whaley are afraid for their own physical safety because of A.S.W.  (Tr. 840.)

Mrs. Whaley testified that there are other problems in the home, including A.S.W.'s father having been incarcerated for abusing A.S.W.'s older sister, and having gone to court for striking A.S.W.  (Tr. 846-47.)

Mrs. Whaley testified that A.S.W. has no friends at school and does not finish school work which is assigned to him. Mrs. Whaley also testified that A.S.W. refuses to turn in his homework even if it is completed, which has resulted in dropped grades.  (Tr. 840-41.)  Mrs. Whaley testified that A.S.W. receives C's and D's as grades, but that he can do better depending upon his

staying on task. (Tr. 845.) Mrs. Whaley also testified that A.S.W. experiences behavioral problems at school and that he does not pay attention to his teachers. (Tr. 841.) Mrs. Whaley testified that during the previous year, they were called to school to address an incident where A.S.W. threatened a fellow band student with an instrument. Mrs. Whaley testified that the school was going to expel A.S.W. if he was not homebound for schooling. (Tr. 840.)

Mrs. Whaley testified that A.S.W. participated in PRIDE classes during his eighth, ninth and tenth grade years. Mrs. Whaley testified that the classes kept him on schedule and that without such classes, A.S.W. would not have received passing grades. (Tr. 843, 849.) Mrs. Whaley testified that she and Mr. Whaley have tried to help A.S.W. with his homework at home but that A.S.W. gets very angry. Mrs. Whaley testified that A.S.W. has difficulty in every class because he cannot stay on task. (Tr. 843.)

Mrs. Whaley testified that A.S.W. sometimes spends time with the son of her friend. Mrs. Whaley testified that A.S.W. has "lots of trouble" with his cousins and fights constantly with them because they boss him around. (Tr. 844.)

Mrs. Whaley testified that the counselors at Cottonwood explained to her that A.S.W.'s behavior is a result of his Oppositional Defiant Disorder whereby anger takes over when he is

"put on the spot." (Tr. 842-43.) Mrs. Whaley testified that A.S.W. has engaged in such defiant behavior his entire life. (Tr. 843.) Mrs. Whaley testified that the treatment received at Cottonwood did not help or change A.S.W. and that she had the impression that Cottonwood counselors expected him to return to the treatment center. (Tr. 845-46.) Mrs. Whaley testified that she does not believe A.S.W. would be better off staying at Cottonwood and testified that she wanted to try new rules at home. (Tr. 847.)

Mrs. Whaley testified that it is a struggle to keep A.S.W. on course with his personal hygiene, stating, "You thought we were killing the boy to make him take a bath." (Tr. 846.)

Mrs. Whaley testified that A.S.W. gets migraine headaches two or three times a month but that he has never missed school because of them. (Tr. 845.)

### III. Medical, Psychiatric and Counselor Records

A.S.W. underwent psychiatric evaluation at Cardinal Glennon Children's Hospital on March 11, 1996. A.S.W. was seven years of age at the time of the evaluation. A.S.W. was reported to be angry, aggressive and oppositional for about one year, with such behavior increasing during the previous five months. It was reported that A.S.W. had occasional nightmares, had difficulty concentrating, and was fearful with separation. Dr. Tom Weeston

noted A.S.W.'s current medications to be Ritalin[2] and Albuterol inhaler.[3]  Dr. Weeston also noted that A.S.W.'s father had been imprisoned for sexual abuse of A.S.W.'s half-sister.  It was noted that A.S.W. was removed from his home in March 1990 due to his abusive mother who suffered from recurrent suicidal-depression.  It was noted that the Division of Family Services (DFS) was heavily involved in providing therapy and sex offender programs for A.S.W.'s father.  It was also noted that A.S.W. had been involved in a motor vehicle accident in June 1995, that his home burned in November 1995, and that he had to move to a new home and new school.  It was noted that since that time, A.S.W.'s nightmares had increased and his problems intensified.  Mental status examination showed A.S.W. to be cooperative and easy to engage in conversation.  Dr. Weeston observed A.S.W. to be a little hyperactive though easily directed.  A.S.W.'s mood was noted to be low and anxious.  His affect was noted to be restricted, stable and appropriate.  Intellectual ability and judgment were noted to be fair and average.  Dr. Weeston diagnosed A.S.W. with Post Traumatic Stress Disorder, with Depressive Disorder to be ruled out.  A.S.W. was assigned a Global Assessment of Functioning (GAF) score of 50.  Dr.

---

[2]Methylphenidate, brand name "Ritalin," is indicated for the treatment of attention deficit disorders.  Physicians' Desk Reference 2206 (55th ed 2001).

[3]Albuterol is indicated for the prevention and relief of bronchospasm in patients with reversible obstructive airway disease.  Physicians' Desk Reference 2922 (55th ed. 2001).

Weeston recommended that A.S.W. continue therapy at Community Counseling Center and that he begin taking Paxil.[4]  (Tr. 327-29.)

A.S.W. returned to Dr. Weeston on April 9, 1996, without much change in his presenting symptoms.  It was noted that A.S.W. discontinued taking Paxil because of stomachaches.  It was reported that A.S.W. sleeps well but that he continues to have nightmares three times a week.  School was noted to be going well, although A.S.W. exhibited problems with boundaries.  Mental status examination showed A.S.W. to be active, intrusive and loud.  It was noted that A.S.W. was easily angered and had tantrums, but that he was not psychotic nor engaged in disorganized play.  It was noted that A.S.W. occasionally threatened his parents with a knife (in idea only), but displayed no ideation of suicide.  Dr. Weeston diagnosed A.S.W. with Oppositional Defiant Disorder (ODD), Dysthymic Disorder[5] and Depression-Not Otherwise Specified.  Post Traumatic Stress Disorder was to be ruled out.  A.S.W. was prescribed Ritalin and Prozac[6] and was instructed to continue with

---

[4]Paxil is indicated for the treatment of Depression. Physicians' Desk Reference 3114-15 (55th ed. 2001).

[5]Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms:  poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness."  Stedman's Medical Dictionary 536 (26th ed. 1995).

[6]Prozac is indicated for the treatment of Depression and is sometimes used to treat Attention Deficit Disorder and Post Traumatic Stress Disorder.  Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a6890

family and individual therapy.  (Tr. 330-31.)

A.S.W. was admitted to Spirit of St. Louis Hospital (Spirit) on November 6, 1998, after having made suicidal ideations, exhibiting self-harmful behaviors, threatening harm to others, and having auditory hallucinations telling him to hurt himself.  A.S.W. was nine years of age and in the fourth grade.  It was reported that A.S.W. had been banging his head against the wall and that he was striking himself in the chest.  It was also noted that three weeks prior, A.S.W. had threatened to kill his father and that his father had just returned home after having been imprisoned for sexually abusing A.S.W.'s sister.  It was noted that A.S.W. had been receiving outpatient treatment at the Community Counseling Center during the previous year, but had failed such treatment. Upon admission to Spirit, it was noted that A.S.W. was taking Depakote,[7] Wellbutrin[8] and Adderall.[9]  A.S.W. received current GAF scores of 40 and 10, with 55 being the highest GAF score achieved during the previous twelve months.  A.S.W. was placed on suicide watch upon his admission to Spirit and was treated with group and

_____

06.html>.

[7]Depakote is indicated for the treatment of the manic episodes associated with Bipolar Disorder.  Physicians' Desk Reference 431-33 (55th ed. 2001).

[8]Wellbutrin is indicated for the treatment of Depression. Physicians' Desk Reference 1485-86 (55th ed. 2001).

[9]Adderall is an amphetamine product indicated as part of a total treatment program for Attention Deficit Disorder with Hyperactivity.  Physicians' Desk Reference 3034 (55th ed. 2001).

individual therapy, medication and other intervention. (Tr. 114-210.)

During his stay at Spirit, A.S.W. reported that he gets into trouble at home for not listening to his parents and for not doing his chores. A.S.W. reported that he gets into trouble at school for not raising his hand and for talking excessively. A.S.W. reported that his peers make fun of him and that he feels sad and angry most of the time. A.S.W. reported that he sometimes feels as though his parents do not love him. A.S.W. reported feelings of hopelessness and helplessness. A.S.W. was observed to be restless and fidgety, with his motor activity noted to be slightly increased. A.S.W. was repeatedly observed not to engage in any assaultive behavior during his admission, although it was noted that A.S.W. had not been provoked at all during his stay. A.S.W. was continually noted to be verbally aggressive. (Tr. 114-210.)

A.S.W. was discharged from Spirit on November 12, 1998. A.S.W.'s final diagnoses upon discharge were Attention Deficit Hyperactivity Disorder (ADHD), ODD, and history of asthma. It was also noted that A.S.W. had educational problems and problems with his primary support group. A.S.W. was assigned a GAF score of 60 upon discharge. A.S.W.'s prognosis upon discharge was noted to be guarded. (Tr. 114-210.)

A.S.W. was admitted to the emergency room at St.

Anthony's Medical Center on September 15, 2001, complaining of pain in his head and blurred vision after having banged his forehead against a wall. A.S.W. also complained of neck pain. (Tr. 788.) It was noted that A.S.W. had come from Hyland[10] and was being evaluated for admission for behavioral problems. (Tr. 788, 791.) It was noted that A.S.W. had been putting large objects on his own head and was hitting his head against walls. (Tr. 791.) A.S.W. was given Tylenol and was discharged that same date back to Hyland. (Tr. 789-91.)

On December 11, 2002, A.S.W. visited Dr. Kishor Khot at Community Counseling Center for medical psychotherapy. It was noted that A.S.W. continued to have increased rapid speech, was not listening, and was exhibiting aggressive behavior at times, including making a hole in a wall. A.S.W. was observed to have a defiant, oppositional attitude. Dr. Khot specifically noted A.S.W. to interrupt conversations. No depression was noted. A.S.W. was diagnosed with Bipolar Disorder and ADHD. It was opined that A.S.W. was more bipolar than ADHD. A.S.W. was to discontinue Dexedrine[11] and was instructed to use Adderall. It was noted that

---

[10]A review of the entire record shows that St. Anthony's Hospital had a unit which was called "Hyland Behavioral Health Center."

[11]Dexedrine is an amphetamine indicated as part of a total treatment program for ADHD. <u>Physicians' Desk Reference</u> 3083-84 (55th ed. 2001).

Topamax[12] was not working and it was discontinued.  Celexa[13] was also discontinued.  Risperdal[14] was started, and A.S.W. was instructed to continue with Seroquel.[15]  A.S.W. was instructed to follow up in one week.  (Tr. 231.)

On December 18, 2002, A.S.W. visited Apple Pediatrics and complained of back pain, cough, headaches, and dizziness.  A.S.W. was diagnosed with pharyngitis and was prescribed an antibiotic.  (Tr. 285.)

A.S.W. returned to Dr. Khot on January 8, 2003.  It was noted that A.S.W. had periods of aggression but that he was generally doing well.  A.S.W. exhibited no signs of depression, psychosis or suicidal ideation.  Dr. Khot continued in his diagnoses of Bipolar Disorder and ADHD and instructed A.S.W. to continue with his medications, with a decrease in Risperdal.  A.S.W. was instructed to follow up in two months.  (Tr. 229.)

---

[12]Topamax is an anticonvulsant medication which decreases abnormal excitement in the brain.  Topamax is used to prevent migraine headaches but not to relieve the pain of migraine headaches when they occur.  Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697012.html>.

[13]Celexa is used to treat Depression.  Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699001.html>.

[14]Risperdal is indicated for the management of the manifestations of psychotic disorders.  Physicians' Desk Reference 1453-54 (54th ed. 2000).

[15]Seroquel is indicated for the management of the manifestations of psychotic disorders.  Physicians' Desk Reference 639-40 (55th ed. 2001).

On January 13, 2003, A.S.W. returned to Apple Pediatrics and complained of dizziness, abdominal pain, cough, and nausea. A.S.W. was prescribed an antibiotic and Motrin. (Tr. 284.)

A.S.W. returned to Apple Pediatrics on March 10, 2003, and complained of headaches, dizziness, chest pain, and sneezing. A.S.W. was diagnosed with allergic rhinitis and Claritin was prescribed. (Tr. 283.)

On March 12, 2003, A.S.W. returned to Dr. Khot who noted A.S.W. to be doing okay. A.S.W. reported that his morning dose of Risperdal made him tired. Dr. Khot noted A.S.W. to be taking Seroquel to help him sleep at night. A.S.W. exhibited no signs of depression, psychosis or suicidal ideation. Dr. Khot continued in his diagnoses of Bipolar Disorder and ADHD and instructed A.S.W. to continue with his medications, with a change in A.S.W.'s Risperdal dosage. A.S.W. was instructed to follow up in three months. (Tr. 224.)

A.S.W. returned to Dr. Khot on April 9, 2003. It was reported that A.S.W. had experienced increased problems since the Risperdal dosage was changed. A.S.W. was noted to be more talkative. A.S.W.'s dosage of Risperdal was increased and he was instructed to continue with his other medications. A.S.W. was instructed to follow up in two months. (Tr. 223.)

On April 15, 2003, A.S.W. continued to complain to Apple Pediatrics of headaches, cough and congestion. A.S.W. was

diagnosed with allergic rhinitis and Claritin was prescribed. (Tr. 282.) On April 30, 2003, A.S.W. complained to Apple Pediatrics of headache pain, back pain and neck pain after having jumped on a trampoline the previous day. On May 27, 2003, A.S.W. complained to Apple Pediatrics of a bad headache. A.S.W.'s mother expressed concern that A.S.W. may have hit his head while in a dunking booth. (Tr. 280.)

On June 11, 2003, Dr. Khot reported that A.S.W. continued to have occasional temper tantrums and lying episodes. A.S.W. exhibited no overt signs of depression, psychosis or suicidal ideation. Dr. Khot continued in his diagnoses of Bipolar Disorder and ADHD and instructed A.S.W. to continue with his medications, with a change in A.S.W.'s Risperdal dosage. A.S.W. was instructed to follow up in three months. (Tr. 224.)

A.S.W. underwent a psychiatric evaluation with Dr. Khot on August 1, 2003, from which it was determined that A.S.W. had Bipolar Disorder, ADHD and ODD. It was also noted that A.S.W. had asthma and experienced severe family issues. A.S.W.'s GAF score was determined to be 60. It was determined that A.S.W. would continue with his medications and learn anger management techniques. (Tr. 219.)

On September 10, 2003, Dr. Khot noted A.S.W. to have started ninth grade. It was reported that A.S.W. had engaged in some oppositional and defiant behavior, but that he was generally

better. It was noted that A.S.W. was enrolled in PRIDE classes and his grades were good. A.S.W. exhibited no signs of depression, psychosis or suicidal ideation. Dr. Khot continued in his diagnoses of Bipolar Disorder, ADHD and ODD and instructed A.S.W. to continue with his medications. (Tr. 218.)

A.S.W. visited Apple Pediatrics on September 18, 2003, and complained of headaches, congestion, cough, and chest and stomach pain. A.S.W. was diagnosed with sinusitis and was prescribed an antibiotic. (Tr. 277.)

On October 8, 2003, Dr. Khot questioned whether A.S.W. experienced side effects from either Risperdal or Seroquel and determined to decrease A.S.W.'s dosages of both medications. Dr. Khot noted A.S.W.'s grades to be good. Dr. Khot continued in his diagnoses of A.S.W. and was encouraged by A.S.W.'s good performance. A.S.W. was instructed to return in one week. (Tr. 216.)

On October 15, 2003, A.S.W. complained to Apple Pediatrics of having diarrhea, vomiting, abdominal pain, headaches, and dizziness. Such symptoms were attributed to a gastrointestinal virus. (Tr. 275.)

A.S.W. returned to Dr. Khot on October 22, 2003, who noted there to be concerns regarding depression. Tension in the home and A.S.W.'s mother's concerns were causing A.S.W. to feel sad. Dr. Khot noted there to be no abnormal depressive symptoms,

however. A.S.W. exhibited no signs of psychosis or suicidal ideation. Dr. Khot continued in his diagnoses of Bipolar Disorder and ADHD and instructed A.S.W. to continue with Adderall and Risperdal. A.S.W. was instructed to follow up in six weeks. (Tr. 213.)

On November 10, 2003, Apple Pediatrics noted that A.S.W. had been in the emergency room on November 6 for bronchial pneumonia. A.S.W. currently complained of continued chest pain. A.S.W. was diagnosed with costochondritis and Naproxen[16] was prescribed. (Tr. 274.)

On December 9, 2003, A.S.W. complained to Apple Pediatrics of intense and bad migraine headaches. A.S.W. also complained of coughing, sore throat, dizziness, pain in his chest and stomach, and pain across his cheeks and temples. A.S.W. was diagnosed with influenza and medication was prescribed. (Tr. 272.)

On December 10, 2003, A.S.W. returned to Dr. Khot. No side effects from his medications were noted. Dr. Khot continued in his diagnoses of Bipolar Disorder, ADHD and ODD and instructed A.S.W. to continue with Adderall and Risperdal. A.S.W. was instructed to return in three weeks. (Tr. 212.)

A.S.W. returned to Apple Pediatrics on December 31, 2003, and complained of bad sinus headaches. A.S.W.'s prescription for

---

[16]Naprosyn (Naproxen) is indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and for the management of pain. Physicians' Desk Reference 2744-45 (55th ed. 2001).

Claritin was refilled. (Tr. 271.)

On January 12, 2004, A.S.W. complained to Apple Pediatrics of pain in his arm since the previous week. A.S.W. reported that he continued to have a lot of pain in the arm and shoulder. A.S.W. was diagnosed with right shoulder strain and physical therapy was prescribed. (Tr. 270.) On February 10, 2004, A.S.W. continued to complain of right shoulder pain. It was noted that DFS wanted a physician's note for A.S.W. to refrain from Physical Education class until the arm healed. A.S.W. also complained to Apple Pediatrics of experiencing headaches with photosensitivity on nearly a daily basis. A.S.W. also complained of rib pain in the sternal area. (Tr. 269.)

On February 19, 2004, James Spence, a consultant for Disability Determinations, completed a Childhood Disability Evaluation Form wherein he determined A.S.W. to have no limitations in the areas of Acquiring and Using Information, Moving About and Manipulating Objects, Caring for Himself, and Health and Physical Well-Being. Mr. Spence determined A.S.W. to have less than marked limitations in the area of Attending and Completing Tasks. Finally, Mr. Spence determined A.S.W. to have marked limitations in the area of Interacting and Relating with Others. (Tr. 258-63.)

On March 4, 2004, a medical consultant with Disability Determinations reviewed Mr. Spence's Childhood Disability Evaluation Form. The medical consultant agreed with all of Mr.

Spence's determinations except that which related to A.S.W.'s limitations in the area of Interacting and Relating with Others. Specifically, the medical consultant opined that A.S.W. had less than marked limitations in this area inasmuch as A.S.W.'s teachers did not report any significant problems with social interaction. (Tr. 264-65.)

On April 15, 2004, A.S.W. returned to Apple Pediatrics and complained of symptoms associated with sinusitis and contact dermatitis. (Tr. 268.)

On May 12, 2004, A.S.W. underwent evaluation at Community Counseling Center. A.S.W. was fifteen years of age at the time of the evaluation. A.S.W.'s parents requested that A.S.W. receive help in learning to deal with his anger and aggression. It was noted that A.S.W. engages in destructive behavior at home during fits of anger, such as throwing things at his parents, punching holes in walls, and breaking items around the home. It was noted that A.S.W. had made verbal threats toward his mother and that DFS had worked closely with the family for the past few years, with its involvement coming after A.S.W.'s father threatened to kill A.S.W. after a disagreement. It was also noted that A.S.W.'s father had been imprisoned for an approximate four-year period for molesting A.S.W.'s older sister. It was further noted that A.S.W. had previously been removed from the home for a six-month period after A.S.W.'s father threatened physical abuse. It was reported that

A.S.W. began hiding weapons in his room to defend himself. (Tr. 293-99.)

During the evaluation, A.S.W.'s parents reported that A.S.W. began having behavioral problems when he entered preschool and that his preschool teacher reported that he could not sit still or be quiet. A.S.W.'s parents reported that A.S.W. was diagnosed with ADHD when he was four years of age. It was noted that A.S.W. had since been diagnosed with ODD and Bipolar Disorder, and that he participates in a work program at the City Court House and in a respite program once a month or as needed. (Tr. 293-99.)

It was noted that A.S.W. has had numerous problems at school throughout his education and has a hard time socially at school. It was noted that A.S.W. makes average grades and receives A's, B's, C's, and D's. It was also noted that A.S.W. is argumentative at home and has tantrums on a regular basis. A.S.W.'s home was noted to be cluttered and soiled with animal feces and fleas. It was reported that A.S.W. does not help much around the house. It was noted that A.S.W.'s parents were a good support system and that his family loved one another and cared deeply about A.S.W.'s well being. It was also noted, however, that A.S.W. had problems with his father, and that such problems have caused a lot of tension in the home. It was reported that there is a lot of yelling in the home, that A.S.W. has threatened harm to his parents, and that A.S.W. has punched holes in the walls and has

thrown things at his mother.  (Tr. 293-99.)

Upon conclusion of the evaluation, A.S.W. was diagnosed with Bipolar Disorder, ADHD and ODD.  It was noted that A.S.W. had severe family issues.  A.S.W.'s GAF was determined to be 60.  It was recommended that A.S.W. participate in the Community Psychiatric Rehabilitation Program (CPRP) at the Intensive level for a period of 60 days with a transfer then to the Rehabilitation level.  Psychiatry was noted to be important for medicine management.  (Tr. 293-99.)

A.S.W. returned to Dr. Khot on May 12, 2004, who noted A.S.W. to be doing well.  It was noted that Trileptal[17] made him a little sleepy at night.  No depression, psychosis or suicidal ideation was noted.  Dr. Khot determined for A.S.W. to discontinue Trileptal, and Depakote was prescribed.  A.S.W. was also instructed to discontinue Risperdal and to continue with Adderall.  A.S.W. was instructed to return in two weeks.  (Tr. 292.)

A.S.W. returned to the Community Counseling Center on July 12, 2004, with his parents.  A.S.W.'s parents reported A.S.W.'s behavior, anger management issues, and argumentation to have improved with such improvement attributed to intervention by "CTCM."  (Tr. 290.)

On July 14, 2004, A.S.W. visited a physician at the Community Counseling Center who noted A.S.W.'s history.  It was

---

[17]Trileptal is an anti-seizure medication.  <u>Physicians' Desk Reference</u> 2223-24 (55th ed. 2001).

noted that A.S.W. and his father did not get along and that A.S.W.'s father called him names. A.S.W. continued to be diagnosed with ADHD, Bipolar Disorder and ODD and was instructed to continue with his medications, including Depakote, Adderall and Trazodone.[18] (Tr. 287.)

On July 15, 2004, A.S.W.'s mother reported to the Community Counseling Center that A.S.W. had engaged in defiant behavior at home which caused her to become upset. During counseling, A.S.W. was instructed to help with chores at home for which he would receive a reward. (Tr. 288.) On July 23, 2004, the Community Counseling Center noted there to be growing family concerns regarding A.S.W. "crossing boundaries" with his parents. A rewards/consequences system was put in place in A.S.W.'s treatment plan. (Tr. 286.)

On August 16, 2004, Licensed Social Worker Christopher Leonard completed a Mental Impairment Questionnaire for Disability Determinations wherein Mr. Leonard indicated that he had been meeting with A.S.W. approximately twice a month since April 2001. Mr. Leonard reported A.S.W.'s current GAF score to be 62 and that A.S.W.'s highest GAF score during the previous year was 62. Mr. Leonard reported that A.S.W. has obtained positive results at times with his treatment, and overall was doing better than when he began

---

[18]Trazodone is used to treat Depression. <u>Medline Plus</u> (last revised Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a681038.html>.

such treatment.  Mr. Leonard reported that A.S.W.'s impairments cause him to suffer mood swings, problems with anger management, oppositional behavior, and hyperactivity, with the level of severity noted to be moderate.  Mr. Leonard opined that A.S.W.'s prognosis was fair to guarded.  Mr. Leonard noted signs and symptoms of A.S.W.'s impairments to include:  thoughts of suicide, feelings of guilt or worthlessness, impairment in impulse control, mood disturbance, difficulty thinking or concentrating, aggressivity, bipolar syndrome with a history of episode periods manifested by the full symptomatic picture of both manic and depressive syndromes, intense and unstable interpersonal relationships, and impulsive and damaging behavior.  Mr. Leonard noted that A.S.W.'s psychiatric condition exacerbates his experience of pain in that A.S.W. currently complains of migraine headaches.  Mr. Leonard opined that A.S.W.'s impairments caused him to have moderate limitations in the areas of activities of daily living and in maintaining social functioning.  Mr. Leonard further opined that A.S.W. suffered moderate to marked limitations in the area of concentration, persistence or pace.  Finally, Mr. Leonard reported that within a twelve-month period, A.S.W. suffered three repeated episodes of decompensation, each lasting a period of two weeks or longer.  Mr. Leonard reported that A.S.W.'s impairments had lasted, or could be expected to last, at least twelve months. Mr. Leonard further reported A.S.W. not to be a malingerer.  (Tr.

302-05.)

A.S.W. was taken to the emergency room at Ste. Genevieve County Memorial Hospital on August 16, 2004, complaining of migraine headaches. When asked when such headaches began, A.S.W.'s mother responded, "When haven't they stopped." A.S.W.'s mother reported that A.S.W. had been having migraine headaches for six months. (Tr. 316.) On a scale of one to five, A.S.W. reported his pain to be at a level four but that the lights and noise in the emergency room caused his pain to increase to a level five. (Tr. 316, 318.) A.S.W. reported feeling nauseous and having photophobia with his headaches, and that Tylenol did not help the pain. (Tr. 318.) A.S.W. was given Toradol[19] and was discharged three hours later in improved condition. (Tr. 317, 319.)

On August 17, 2004, A.S.W. was admitted to the emergency room at St. Anthony's Medical Center complaining of having migraine headaches for two days. (Tr. 776.) A.S.W. described the pain as a level eight on a scale of one to ten. (Tr. 777.) A.S.W. complained of experiencing nausea, light sensitivity and sound sensitivity with the headaches. It was noted that Toradol and Tylenol provided no relief. (Tr. 776.) It was noted that A.S.W. required assistance with activities of daily living. (Tr. 777.)

---

[19]Toradol is indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level. Physicians' Desk Reference 2789-91 (55th ed. 2001).

Zofran[20] and Toradol were administered with no change.  Improvement was noted upon administration of Compazine.[21]  (Tr. 779-81.)  A.S.W. was discharged that same date and was prescribed ibuprofen.  (Tr. 778-79.)

A.S.W. returned to the emergency room at Ste. Genevieve County Memorial Hospital on September 15, 2004, complaining of having migraine headaches for a few weeks.  (Tr. 312.)  A.S.W. was given Toradol and Phenergan[22] and was discharged one hour later.  A.S.W.'s condition was unchanged upon discharge.  (Tr. 313.)

A CT scan of A.S.W.'s head was taken on October 6, 2004, in response to A.S.W.'s complaints of headaches.  A small amount of inflammatory material was noted within the right side of the sphenoid sinus.  Otherwise, the results of the CT scan were unremarkable.  (Tr. 311.)

On October 11, 2004, A.S.W. returned to the emergency room at Ste. Genevieve County Memorial Hospital with complaints of psychiatric issues.  It was noted that A.S.W. had had trouble with

[20]Zofran is indicated for the prevention of nausea and vomiting.  Physicians' Desk Reference 1503-04 (55th ed. 2001).

[21]Compazine is indicated for control of severe nausea and vomiting, for management of the manifestations of psychotic disorders, and for the short-term treatment of generalized non-psychotic anxiety.  Physicians' Desk Reference 2077-78 (55th ed. 2001).

[22]Phenergan is used to relieve symptoms of allergic reactions, to relax and sedate patients, and to prevent and control upset stomach and vomiting.  Medline Plus (last revised Oct. 1, 2005) <http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682284.html>.

kids and exhibited increased aggressive behavior with his family and caseworker that day. (Tr. 307.) Specifically, A.S.W. was kicking furniture, slamming doors, stomping his feet, and displayed thoughts of hurting himself but indicated no plan. It was noted that this was the worst episode witnessed by A.S.W.'s family and caseworker. (Tr. 309.) A.S.W. was cooperative and calm in the emergency room. (Tr. 307, 309.) It was determined that A.S.W. would be transported to a psychiatric facility for further treatment, and A.S.W. was then transported by ambulance to the Hyland Behavioral Health Center of St. Anthony's Hospital for inpatient care. (Tr. 308, 310.)

A.S.W. was admitted to St. Anthony's Hospital on October 12, 2004. It was noted that A.S.W. had threatened students and had his book bag searched at school for a weapon. It was also noted that A.S.W. was aggressive with his parents and had thoughts of harming himself. It was noted that A.S.W. engaged in head banging and punches walls. It was also noted that the family had been in counseling for five years. A.S.W. was diagnosed with Bipolar Disorder and ADHD upon admission and was assigned a GAF score of 40. A.S.W.'s dosage of Depakote was increased during his admission to St. Anthony's and A.S.W. showed no oppositional behavior while he was in the hospital. It was noted that A.S.W.'s school would not allow him to return, and admission to a residential facility was recommended. Arrangements could not be made with such a

facility prior to A.S.W.'s discharge from St. Anthony's, and A.S.W. was discharged to home on October 15, 2004. Upon discharge, A.S.W. was diagnosed with Bipolar Disorder, Attention Deficit Disorder and ODD, with medical issues including gastroesophageal reflux disease (GERD), sinusitus and migraine headaches. A.S.W. was prescribed Depakote, Adderall, Zyprexa,[23] and Zoloft[24] upon discharge, and was assigned a GAF score of 60. (Tr. 757-74.)

A.S.W. was admitted to Cottonwood Treatment Center on November 18, 2004. A.S.W.'s previous admissions to Hyland and Spirit of St. Louis Hospital were noted, as well as A.S.W.'s treatment at Community Counseling Center. A.S.W.'s parents reported that any progress from such treatments was short lived. It was noted that A.S.W. had become more threatening at school and was homebound due to the school's invocation of the Safe Schools Act. A.S.W.'s previous two admissions to foster care were noted as well as his having been reported to juvenile authorities by his parents on five occasions due to his threatening behavior toward them. A.S.W.'s parents reported that A.S.W. has had some training in karate, but that they discontinued lessons when parents of A.S.W.'s peers began calling and reporting that A.S.W. was using

---

[23]Zyprexa is indicated for the management of the manifestation of psychotic disorders, including Schizophrenia, and the manic episodes associated with Bipolar Disorder. Physicians' Desk Reference 1788-89 (55th ed. 2001).

[24]Zoloft is indicated for the treatment of Depression. Physicians' Desk Reference 2553-54 (55th ed. 2001).

his karate skills on their children. A.S.W.'s parents reported that A.S.W. has stolen money from them, and has stolen knives from them which they later found in his room under his pillow. A.S.W.'s mother reported that she will not be left alone with A.S.W. until family therapy has occurred. A.S.W. was admitted to a secure cottage to be monitored. (Tr. 322-25.)

On December 9, 2004, A.S.W. underwent a Social Service Assessment at Cottonwood wherein A.S.W.'s behavioral history was reviewed. A.S.W.'s parents reported to Case Manager Amy Edwards that A.S.W.'s aggression had worsened and that his behavior had decompensated during the past several months. A.S.W.'s Community Counseling Center caseworker reported that the Counseling Center had exhausted its services with A.S.W., including psychiatric care, counseling, targeted case management, and residential services, and that none of such services had been effective. It was reported that during the past seven to ten months, A.S.W.'s behaviors had escalated

> to the point that he destroyed property in the home, physically intimidated his parents, throwing objects at his mother, refuses consequences, refuses to obey rules in the home, verbally threatening to family and peers and staff at school, kicked pets at home, refusing to take medications and self-harm of hitting head on wall.

(Tr. 346.)

Ms. Edwards noted that A.S.W. was aware of how to control his

temper but chose not to employ learned anger management techniques. It was noted that A.S.W. has had various problems at school throughout his education but that he only recently began displaying aggression at school, and specifically, began threatening students with physical harm. Ms. Edwards noted that since being admitted to Cottonwood, A.S.W. has had difficulty with irritability, negative peer interactions, and authority issues with his mother. It was also noted, however, that such behaviors were minimal and that A.S.W. was adjusting to the structure and guidance provided at the facility. A.S.W. was diagnosed with Bipolar Disorder, ADHD and ODD, with psychosocial stressors noted to include family support (severe), social environment (severe) and education (moderate). A.S.W.'s GAF score was determined to be 55. (Tr. 346-47A.)

On December 18, 2004, A.S.W. underwent a Medical and Psychiatric Assessment at Cottonwood. Dr. Asif Habib noted A.S.W.'s behavioral history to include anger, aggression, mood swings, irritable mood, and behavioral problems. A.S.W. currently denied being depressed or of currently experiencing any manic symptoms. Dr. Habib noted A.S.W. to be medication compliant. Mental status examination was unremarkable. Dr. Habib opined that A.S.W.'s behavioral problems manifested when he learned of his father's abuse of his sister and that he is acting out of anger, is unable to control his anger, and cannot stabilize his emotions. Dr. Habib diagnosed A.S.W. with ADHD and ODD and noted A.S.W.'s

psychosocial stressors to be family support, social and educational problems.  Dr. Habib assigned a GAF score of 25.  (Tr. 348-48A.)

On December 21, 2004, A.S.W. underwent consultation in the Neurology Clinic at Cardinal Glennon Children's Hospital in relation to his long-standing complaints of headaches which had recently increased in frequency and intensity.  Dr. Thomas J. Geller noted A.S.W. to have had the headaches for at least one year and that they had been managed with valproic acid.[25]  A.S.W. described the pain as sharp and needle-like and rated the pain at a level eight on a scale of one to ten.  A.S.W. reported the headaches to sometimes be associated with dizziness and that he experienced photophobia and phonophobia with more severe headaches. Dr. Geller noted A.S.W. to have been taking valproic acid for three months as well as other medications for behavior management, including Adderall, Zoloft and Zyprexa.  Dr. Geller reviewed A.S.W.'s past medical history and noted significant problems with behavior since an early age and continued substantial behavioral issues.  Review of systems showed occasional episodes of lightheadedness with near fainting, moodiness, and occasional insomnia.  Dr. Geller noted there to be evidence of short attention span and impulse control problems in the past, for which A.S.W. was

---

[25]Valproic acid is marketed under the brand name "Depakote" and is used to treat seizures, mania in people with Bipolar Disorder, and to prevent migraine headaches.  Medline Plus (last revised Oct. 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682412.html>.

currently undergoing therapy. Mental status examination showed A.S.W.'s speech to be slow and deliberate, with slightly simple content but some degree of insight into his problems. Examination of the cranial nerves and sensory exam was unremarkable, except that A.S.W. had difficulty with rapid alternating movements of the fingers and hands. A.S.W. was diagnosed with common migraine headache with associated tension headache, as well as Attention Deficit Disorder and ODD. Dr. Geller opined that Depakote was adequate as a prophylaxis and suggested that Zomig[26] be taken for more intense pain. (Tr. 332-36.)

A CT scan of the head taken December 29, 2004, in response to A.S.W.'s complaints of headaches was normal. (Tr. 356.)

On January 6, 2005, Dr. K.P.S. Kamath examined A.S.W. for Disability Determinations. A.S.W.'s behavioral history was noted. Mental status examination showed A.S.W. to have feelings of depression at times, but with no suicidal ideas or persistent feelings of sadness, hopelessness or helplessness. A.S.W. reported that he had had mood swings in the past, but not at the current time. Dr. Kamath noted A.S.W.'s daily activities to include participating in school and in other various activities at Cottonwood. Dr. Kamath noted A.S.W. to receive A and B grades. Dr. Kamath diagnosed plaintiff with ADHD – predominantly

_____

[26]Zomig is indicated for the acute treatment of migraine with or without aura. Physicians' Desk Reference 665 (55th ed. 2001).

hyperactive-impulsive type, and Bipolar Disorder. A.S.W.'s GAF score was determined to be 50. Upon conclusion of the examination, Dr. Kamath reported that A.S.W. was a product of a dysfunctional family but that his

> ability to relate to other people is fair to good at this time. There is no significant degree of social isolation. He is able to care for basic personal needs. There is no significant constriction of interests and habits. He can comprehend and follow instructions. He can perform simple repetitive tasks. His ability to cope with stress and pressures of routine school activity is good.

(Tr. 350-51.)

In a Mental Medical Source Statement completed that same date, Dr. Kamath opined that A.S.W.'s ADHD did not affect A.S.W.'s ability to understand, remember and carry out short, simple instructions. Dr. Kamath opined that A.S.W.'s ADHD moderately affected A.S.W.'s ability to understand, remember and carry out detailed instructions. Dr. Kamath further opined that A.S.W.'s impulse control problems interfered with his ability to appropriately interact with others, and specifically, caused moderate limitations in his ability to interact with peers, slight limitations in his ability to interact with classmates, and no limitations in his ability to interact with teachers. Dr. Kamath determined that A.S.W.'s impairments slightly affected his ability to respond appropriately to school pressures and changes in a routine school

setting.  (Tr. 352-54.)

Throughout A.S.W.'s stay at Cottonwood, he underwent continued individual, family and recreational therapy, as well as received educational assistance and medical intervention.  (374-755.)  Each month, primary therapist Amy Edwards and caseworker Betty Brown reviewed A.S.W.'s behavioral condition and progress with A.S.W., his parents and his caseworker from Community Counseling Center.  (Tr. 365-73.)  In her Monthly Clinical Update dated January 6, 2005, Ms. Edwards reviewed A.S.W.'s case for the four-week period ending January 4, 2005.  (Tr. 372-73.)  A.S.W.'s current medications were noted to include Depakote, Zyprexa, Adderall, Zoloft, and Daypro.[27]  (Tr. 372.)  With respect to his education, it was noted that A.S.W. had 100% work completion and classroom behavior.  A.S.W. had 93% attendance, attending two hours each day with one hour of homebound instruction.  Recreational therapy showed A.S.W. to respond appropriately with peers and staff, but that he continued to engage in excessively loud verbal behavior.  With respect to A.S.W.'s therapeutic needs, it was noted that A.S.W. had no safety issues during the relevant period; that A.S.W. had exhibited oppositional and defiant behaviors, and specifically, engaged in two episodes of argumentative attitude, thirteen episodes of non-compliance, and two episodes of blaming

---

[27]Daypro is indicated for acute and long-term use in the management of signs and symptoms of osteoarthritis and rheumatoid arthritis.  Physicians' Desk Reference 2993-94 (55th ed. 2001).

others for mistakes; that A.S.W. had exhibited maladaptive social interactions, and, specifically, five episodes of negative communication with peers; and that A.S.W. had exhibited core symptoms of mood instability, and specifically, one episode of frustration intolerance. (Tr. 372-73.) It was noted that A.S.W. had had consistent and stable passes with his parents. A.S.W. continued to be diagnosed with Bipolar Disorder, ADHD and ODD, and was assigned a current GAF score of 25. (Tr. 373.)

Dr. Habib examined A.S.W. at Cottonwood on January 15, 2005. A.S.W. complained to Dr. Habib that he had increased difficulty with focus as well as difficulty sleeping and less interest during the day. A.S.W. denied any manic symptoms or psychosis. Mental status examination showed A.S.W.'s mood to be euthymic, and his judgment and insight to be limited. A.S.W. had no suicidal or homicidal ideations, and no paranoia. Dr. Habib instructed A.S.W. to continue with his medications and therapy, with an increase in his dosage of Zyprexa. (Tr. 697.) A.S.W.'s dosage of Adderall was likewise increased. (Tr. 392.)

In her Monthly Clinical Update dated February 3, 2005, Ms. Edwards reviewed A.S.W.'s case for the four-week period ending February 2, 2005. A.S.W.'s current medications were noted to include Depakote, Zyprexa, Adderall, Zoloft, and Daypro. (Tr. 371.) With respect to his education, it was noted that A.S.W. had 100% work completion and 98% classroom behavior. A.S.W. had 89%

attendance due to pass and a doctor's appointment. It was noted that A.S.W. had recently had a school meeting whereby it was determined that A.S.W. did not meet the criteria to qualify for special services. (Tr. 371, 382.) It was further noted that A.S.W. would have homebound instruction only. (Tr. 371.) A.S.W. would be responsible for doing his work on his own throughout the remainder of the school day. Because of concerns regarding A.S.W.'s social interactions, he was not permitted to go off grounds to the high school. (Tr. 382.) Recreational therapy showed A.S.W. to display appropriate interaction with staff and peers 92% of the time, and that he had had one "rough group." It was noted that A.S.W. engaged in excessively loud verbal behavior and displayed an increase in making odd noises and sounds during group activity. It was noted that A.S.W. had positive/appropriate interactions 80% of the time for three months, and had followed rules and directions 80% of the time for three months. With respect to A.S.W.'s therapeutic needs, it was noted that A.S.W. exhibited adverse behavior with regard to safety issues, and specifically, engaged in two episodes of verbal aggression and one episode of property destruction; and that A.S.W. had exhibited oppositional and defiant behaviors, and specifically, engaged in six episodes of argumentative attitude and thirty-four episodes of non-compliance. (Tr. 371.)

On February 18, 2005, Dr. Habib reported to Ms. Edwards

that medication was not effective for oppositional behavior. (Tr. 602.)

Dr. Habib examined A.S.W. at Cottonwood on February 23, 2005. A.S.W. and his mother reported that he was "unable to keep [his] mouth shut" and asked if there was medication to help this. A.S.W. reported that he was not currently depressed or experienced manic symptoms. Dr. Habib observed A.S.W.'s mood to euthymic. A.S.W. exhibited no paranoia or suicidal or homicidal ideations. A.S.W.'s concentration was noted to be fair, with limited insight and judgment. A.S.W. was diagnosed with ADHD and ODD and was assigned a GAF score of 25. A.S.W. was instructed to continue with his medications and with therapy. (Tr. 617.)

In her Monthly Clinical Update dated March 3, 2005, Ms. Edwards reviewed A.S.W.'s case for the four-week period ending March 1, 2005. (Tr. 369-70.) A.S.W.'s current medications were noted to include Depakote, Zyprexa, Adderall, Zoloft, and Daypro. (Tr. 369.) With respect to his education, it was noted that A.S.W. received one hour of homebound instruction. A.S.W. had 75% work completion and 100% attendance. A.S.W.'s teacher reported that A.S.W. needed to continue to work on not giving up so easily. It was also reported that A.S.W. was not using his time to work on homework and that, at times, he was not turning in his work. It was recommended that A.S.W. transition to two hours of attendance at the public school to further challenge him. Recreational

therapy showed A.S.W. to have had a good month and to have interacted appropriately with peers and staff. It was noted that A.S.W. responded to redirection but needed occasional reminders. With respect to A.S.W.'s therapeutic needs, it was noted that A.S.W. exhibited adverse behavior with regard to safety issues, and specifically, engaged in one episode of property destruction; that A.S.W. had exhibited oppositional and defiant behaviors, and specifically, engaged in four episodes of argumentative attitude, twenty-one episodes of non-compliance, and one episode of blaming others for mistakes; that A.S.W. had exhibited maladaptive social interactions, and specifically, engaged in seven episodes of negative communication with peers; and that A.S.W. had exhibited core symptoms of mood instability, and specifically, engaged in one episode of frustration intolerance. (Tr. 369.) It was noted that A.S.W. had difficulty while on passes with his parents in the areas of pushing limits, arguing, manipulating, crossing boundaries, and being demanding. A.S.W.'s discharge from Cottonwood was not recommended. A.S.W. was diagnosed with ADHD and ODD, and was assigned a current GAF score of 25. (Tr. 370.)

On March 10, 2005, Ms. Edwards noted that the Cottonwood administrator denied the request for A.S.W. to go off grounds to attend public school, reasoning that by not having an IEP for A.S.W., there would be a lack of supervision over A.S.W. at the high school. (Tr. 376.)

On March 12, 2005, A.S.W. received Tylenol to take for head pain after hitting his head on a wall. (Tr. 582.)

Dr. Habib examined A.S.W. at Cottonwood on March 28, 2005. A.S.W. reported to Dr. Habib that he had been doing well and had no manic symptoms. A.S.W. also denied hearing voices or seeing unusual things. Mental status examination showed A.S.W. to be euthymic with coherent thought processes. A.S.W. had no suicidal or homicidal ideations. A.S.W.'s concentration was fair. Dr. Habib noted A.S.W.'s judgment and insight to be limited. A.S.W. was instructed to continue with his medications and with the various therapy modalities. (Tr. 543.)

In her Monthly Clinical Update dated April 1, 2005, Ms. Edwards reviewed A.S.W.'s case for the four-week period ending April 1, 2005. (Tr. 367-68.) A.S.W.'s current medications were noted to include Depakote, Zyprexa, Adderall, Zoloft, and Daypro. With respect to his education, it was noted that A.S.W. had 50% work completion and 100% attendance. Recreational therapy showed A.S.W. to have had a good month and that, overall, he interacted appropriately with peers and staff. He continued to use excessive verbal tones and to make noise. It was noted that A.S.W. responded to redirection but needed occasional reminders. With respect to A.S.W.'s therapeutic needs, it was noted that A.S.W. exhibited adverse behavior with regard to safety issues, and specifically, engaged in one episode of physical aggression; that A.S.W. had

exhibited oppositional and defiant behaviors, and specifically, engaged in thirteen episodes of argumentative attitude, twenty-five episodes of non-compliance, and two episodes of blaming others for mistakes; that A.S.W. had exhibited maladaptive social interactions, and specifically, engaged in four episodes of negative communication with peers; and that A.S.W. had exhibited core symptoms of mood instability, and specifically, engaged in six episodes of frustration intolerance. (Tr. 367.) It was noted that A.S.W. had hit and kicked a peer during the previous month after becoming angry at the peer for antagonizing him. A.S.W. was placed on Assault Precaution as a result. A.S.W.'s continued difficulty with his parents was also noted, and specifically, that A.S.W. continued to display rude and disrespectful behavior toward them at home. A.S.W. was diagnosed with ADHD and ODD, and was assigned a current GAF score of 25. (Tr. 368.)

In her Monthly Clinical Update dated May 6, 2005, Ms. Edwards reviewed A.S.W.'s case for the four-week period ending May 2, 2005. (Tr. 365-66.) A.S.W.'s current medications were noted to include Depakote, Zyprexa, Adderall, Zoloft, and Daypro. (Tr. 365.) With respect to his education, it was noted that A.S.W. had 40% work completion and 100% attendance, and that A.S.W. had excellent behavior with his homebound teacher. Recreational therapy showed A.S.W. to have performed well in groups and to have been helpful to a peer. Continued loud verbal tones and making

noise was noted.  With respect to A.S.W.'s therapeutic needs, it was noted that A.S.W. had no safety issues; that A.S.W. had exhibited oppositional and defiant behaviors, and specifically, engaged in twenty-one episodes of argumentative attitude, thirty-two episodes of non-compliance, and three episodes of blaming others for mistakes; that A.S.W. had exhibited maladaptive social interactions, and specifically, engaged in four episodes of negative communication with peers; and that A.S.W. had exhibited core symptoms of mood instability, and specifically, engaged in five episodes of frustration intolerance.  (Tr. 365.)  It was noted that A.S.W. continued to have difficulty with authority issues at home and at Cottonwood.  A.S.W.'s parents reported that A.S.W. had been better overall at home while on passes, but that he continued to have difficulty doing his school work.  It was noted that A.S.W. becomes argumentative about homework when he is not able to participate with the group.  A.S.W. was diagnosed with ADHD and ODD, and was assigned a current GAF score of 25.  (Tr. 366.)

On May 12, 2005, A.S.W. complained to Cottonwood staff of a headache and that he could not breathe.  Tylenol was given for the headache.  (Tr. 437.)

### IV.  School Records

From 1995 through 2000, A.S.W. attended the first through fifth grades at Vineland Elementary where he earned A, B and C grades throughout.  (Tr. 104.)  On standardized tests administered

in the first grade, A.S.W. scored in the sixty-eighth percentile in Reading, the seventy-ninth percentile in Language Arts, and the seventieth percentile in Mathematics. On standardized tests administered in the second grade, A.S.W. scored in the thirty-second percentile in Reading, the fifty-eighth percentile in Language Arts, and the sixtieth percentile in Mathematics. (Tr. 105.)

In the 2000-2001 school year, A.S.W. was in the sixth grade at Ste. Genevieve Middle School and earned A, B, C, and D grades. In the 2001-2002 school year, A.S.W. was in the seventh grade at Ste. Genevieve Middle School and earned A, B, C, and D grades, as well as some grades of Incomplete. In the 2002-2003 school year, A.S.W. was in the eighth grade at Ste. Genevieve Middle School and earned A, B, C, and D grades, as well as some grades of Incomplete. At the conclusion of eighth grade, A.S.W. was ranked 120th out of 181 students. (Tr. 92.) In the 2003-2004 school year, A.S.W. was in the ninth grade at Ste. Genevieve High School and received A, B, C, and D grades. A.S.W. was ranked eightieth out of 185 students. (Tr. 100.)

On February 9, 2004, Patricia K. Bauman of Ste. Genevieve High School completed a Teacher Questionnaire for Disability Determinations. (Tr. 83-90.) Ms. Bauman reported A.S.W. to be in the tenth grade at the time she completed the questionnaire.[28] Ms.

_____

[28]From the above referenced school records, however, it would appear that A.S.W. was in the ninth grade at the time Ms. Bauman

Bauman tutored A.S.W. in a classroom for at-risk children which had a student-to-teacher ratio of eight to one. Ms. Bauman reported that she had known A.S.W. for seven months and worked with him in the classroom for fifty minutes a day. (Tr. 83.) Ms. Bauman reported that she observed no problems with A.S.W. in the area of Acquiring and Using Information. (Tr. 84.) Ms. Bauman reported that she observed A.S.W. to have a slight problem in the area of Attending and Completing Tasks, and specifically, that A.S.W. had a slight problem waiting to take turns, changing from one activity to another without being disruptive, and working without distracting himself or others. In this area, Ms. Bauman reported that A.S.W. talked and made noises so that others would pay attention to him. Ms. Bauman stated that A.S.W. wanted his needs met immediately but would calm down and do his work when told to do so. Ms. Bauman opined that A.S.W. did not have a behavior problem. (Tr. 85.) In the area of Interacting and Relating with Others, Ms. Bauman reported that she observed A.S.W. to have a slight problem playing cooperatively with other children, seeking attention appropriately, relating experiences and telling stories, and taking turns in a conversation. Ms. Bauman reported that A.S.W. had an obvious problem in making and keeping friends. (Tr. 86.) Ms. Bauman reported that she observed A.S.W. to have no problem in the area of Moving About and Manipulating Objects or in the area of

---

completed the questionnaire.

Caring for Himself. (Tr. 87-88.) Ms. Bauman stated that she was unaware whether A.S.W. was prescribed or took medication and thus whether A.S.W.'s functioning changed after taking medication. (Tr. 89.) Ms. Bauman concluded that A.S.W. was "an intelligent young man who craves attention. He will disturb others so they will pay attention to him. . . . He has <u>never</u> been a behavior problem." (Tr. 90.) (Emphasis in original.)

In the first quarter of the 2004-2005 school year, A.S.W. was in the 10th grade at Ste. Genevieve High School and received B, C and D grades. During this first quarter, A.S.W. had twenty-eight unexcused absences from class periods and four unexcused tardies to class periods. (Tr. 101.)

## V. The ALJ's Decision

The ALJ found A.S.W. not to have engaged in substantial gainful activity at any time relevant to the decision. The ALJ found A.S.W.'s impairments of ADHD, ODD and Bipolar Disorder to be severe but not to meet, medically equal, or functionally equal the severity of any impairment in the Listings of Impairments. The ALJ thus determined A.S.W. not to be under a disability at any time through the date of the decision. (Tr. 12-18.)

## VI. Discussion

A claimant under the age of eighteen is considered disabled and eligible for Supplemental Security Income (SSI) under the Social Security Act if he "has a medically determinable

physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits. First, the Commissioner must determine whether the child is engaged in substantial gainful activity. If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe. Finally, if the child's impairment(s) is severe, the Commissioner must determine whether such impairment(s) meets, medically equals or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the Regulations. 20 C.F.R. § 416.924(a); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004). If the impairment(s) meets or medically equals a Listing, the child is disabled. Garrett, 366 F.3d at 647. If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the Listings. 20 C.F.R. § 416.926a. To functionally equal a listed impairment, the child's condition must result in an "extreme" limitation of functioning in one broad

area of functioning, or "marked" limitations of functioning in two broad areas of functioning. 20 C.F.R. § 416.926a(a). If this analysis shows the child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled. Oberts o/b/o Oberts v. Halter, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Young v. Shalala, 52 F.3d 200 (8th Cir. 1995) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision. Id. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Id.

In this cause, plaintiff raises no issue relating to the Commissioner's determination that A.S.W.'s impairments do not meet or medically equal a listed impairment. Instead, plaintiff argues that the Commissioner legally erred in his determination that A.S.W.'s impairments do not functionally equal a listed impairment

inasmuch as the ALJ engaged in little or no rationale in reaching his conclusions. Plaintiff further contends that, nevertheless, the ALJ's decision is not supported by substantial evidence on the record as a whole inasmuch as the objective evidence of record fails to support the ALJ's cursory conclusions.

As set out above, when a child's severe impairments are determined not to meet or medically equal a Listing, the Commissioner is required to determine whether and to what extent the child's impairments affect broad areas of functioning as defined by the Regulations, and thus whether such impairments functionally equal a Listing. To "functionally equal the Listings," the impairment must be of Listing-level severity, i.e., it must result in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making such a determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being. Id. As such, to be determined disabled, a child-claimant must have an "extreme" limitation in one domain or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a).

Under the Social Security Regulations, a child-claimant has a "marked" limitation in a domain when his

> impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities. [His] day-to-day functioning may be seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i).

A child will be found to have an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). In determining whether a child-claimant's functioning may be marked or extreme, the Commissioner is to review all the evidence of record and "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); <u>see also</u> 20 C.F.R. § 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how appropriately, effectively and independently [the child] perform[s] [his] activities compared to the performance of other children [the child's] age who do not have impairments."); 20 C.F.R. § 416.924a(b)(5). For children who have spent time in structured or supportive settings, such as special classrooms or residential facilities, the Commissioner is to

consider whether and to what extent such structured setting affects the child's functional limitations and how the child would function outside of such setting. 20 C.F.R. § 416.924a(b)(5)(iv).

A review of the ALJ's decision in this cause shows him to have summarized the evidence of record and conclude that A.S.W. suffered marked limitations in the domain of Interacting and Relating with Others; less than marked limitations in the domains of Attending and Completing Tasks, and Caring for Oneself; and no limitations in the domains of Acquiring and Using Information, Moving About and Manipulating Objects, and Health and Physical Well-Being. (Tr. 17.) While plaintiff does not dispute the ALJ's findings with respect to the domains of Interacting and Relating with Others and Moving About and Manipulating Objects, plaintiff contends that the ALJ failed to properly analyze the evidence of record with respect to the remaining domains and erred by rendering only cursory conclusions thereon. In addition, plaintiff contends that a review of the record as a whole nevertheless shows there not to be substantial evidence supporting these conclusions. For the following reasons, plaintiff's arguments are well taken.

A.   *Acquiring and Using Information*

For the domain of Acquiring and Using Information, the Commissioner is to consider "how well [the child] acquires and learns information, and how well [the child] uses information learned." 20 C.F.R. § 416.926a(g).

> Thinking is the application or use of information you have learned.  It involves being able to perceive relationships, reason, and make logical choices. . . . You must also be able to use language to think about the world and to understand others and express yourself; e.g., to follow directions, ask for information, or explain something.

20 C.F.R. § 416.926a(g)(1)(ii).

The Regulations provide that an adolescent between the ages of twelve and eighteen should be able to

> demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments).  You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas).  You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer).

20 C.F.R. § 416.926a(g)(2)(v).

In the instant case, the ALJ found that A.S.W. had no limitations in this domain, finding only that "[s]chool teachers report no problems in this domain.  His grades at school are generally fairly good within the A and B range."  (Tr. 17.)

As noted by the plaintiff, the ALJ's analysis of A.S.W.'s

- 52 -

functional abilities/limitations in this domain is incomplete. For example, although the ALJ states that A.S.W.'s grades are "fairly good within the A and B range," the only evidence cited to support this conclusion are A.S.W.'s grades from the 1998-1999 and 1999-2000 school years. (Tr. 15.) A.S.W. was in the fourth and fifth grades those years, respectively. The ALJ wholly fails to address the grades received by A.S.W. subsequent to those years, which include numerous C's and D's as well as some grades of Incomplete. In addition, the ALJ fails to address the extent to which A.S.W.'s participation in structured educational settings, including PRIDE classes and Cottonwood's homebound education, affected A.S.W.'s ability to function in this domain and/or the level to which A.S.W. could sustain any functional abilities outside of such settings. 20 C.F.R. § 416.924a(b)(7)(iv) ("[W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments."). See also 20 C.F.R. § 416.924a(b)(5)(iv).

In his abbreviated analysis finding A.S.W. to have no limitations in this domain, the ALJ did not address relevant evidence in the record and failed to provide any reason why such evidence should be discounted or not considered. Nor did the ALJ address the extensive nature of special educational settings and accommodations provided to A.S.W., as required by the Regulations, and the effect such settings had on A.S.W.'s functional abilities

in this domain. Although an ALJ is not required to explain all the evidence of record, Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000), he nevertheless cannot merely "pick and [choose] only evidence in the record buttressing his conclusion." Taylor o/b/o McKinnies v. Barnhart, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004), and cases cited therein.

> The ALJ may have considered and for valid reasons rejected the . . . evidence proffered . . . ; but as he did not address these matters, we are unable to determine whether any such rejection is based on substantial evidence. Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision; we cannot speculate whether or why an ALJ rejected certain evidence. Accordingly, remand is necessary to fill this void in the record.

Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995) (citation omitted).

B.    *Attending and Completing Tasks*

For this domain, the Commissioner is to consider how well the child is able to focus and maintain his attention, and how well the child can begin, carry through, and finish his activities, including the pace at which he performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h).

> Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long

> enough to initiate and complete an activity or
> task, and changing focus once it is completed.
> It also means that if you lose or change your
> focus in the middle of a task, you are able to
> return to the task without other people having
> to remind you frequently to finish it.

20 C.F.R. § 416.926a(h)(1)(i).

The Regulations provide that an adolescent between the ages of twelve and eighteen should be able to

> pay attention to increasingly longer
> presentations and discussions, maintain your
> concentration while reading textbooks, and
> independently plan and complete long-range
> academic projects. You should also be able to
> organize your materials and to plan your time
> in order to complete school tasks and
> assignments. In anticipation of entering the
> workplace, you should be able to maintain your
> attention on a task for extended periods of
> time, and not be unduly distracted by your
> peers or unduly distracting to them in a
> school or work setting.

20 C.F.R. § 416.926a(h)(2)(v).

In the instant case, the ALJ found A.S.W. to have less than marked limitations in this domain, finding only that

> [s]chool records show that he has some
> problems completing tasks. He does not always
> want to wait his turn. He wants his needs met
> immediately. His actions distract others and
> himself from the task at hand. His parents
> report that he must redo some chores such as
> cleaning his room. It is hard to get him away
> from the TV to brush his teeth. He has
> problems getting ready for bed.

(Tr. 17.)

In reaching this conclusion, the ALJ appears to rely on the questionnaire completed by Ms. Bauman in February 2004 and on limited remarks by A.S.W.'s parents. The ALJ fails to acknowledge the August 2004 report of Social Worker Christopher Leonard, A.S.W.'s counselor for over four years, which indicated that A.S.W. displayed difficulty with, <u>inter alia</u>, thinking, concentration and impulse control, and indeed opined that A.S.W. suffered moderate to marked limitations in the area of concentration, persistence or pace. (Tr. 302-05.) In addition, and most troubling, is the ALJ's complete failure to discuss and/or acknowledge in this domain the daily reports completed by Cottonwood counselors in 2005 which consistently show A.S.W. to be "off task," not to be focused, and to constantly require redirection. (<u>See</u> Tr. 429-755.)

An examination of the reports from Cottonwood counselors show every counselor to report A.S.W.'s significant problems with concentration, focus, maintaining attention, and staying on task. While it was noted that A.S.W. sometimes responded with redirection, there is no indication that those efforts were successful or sustainable for any length of time. <u>See</u> 20 C.F.R. § 416.924a(b)(3)(i) ("When we evaluate your functioning, . . . [w]e will also look at how well you do the activities [that other children your age typically do] and how much help you need from your . . . teachers, or others."); <u>see also</u> <u>Roelandt v. Apfel</u>, 125

F. Supp. 2d 1138, 1148 (S.D. Iowa 2001) (reversing ALJ denial of benefits and finding substantial evidence of marked limitation in ability to attend and complete tasks where evidence showed that child-claimant was not able to focus and maintain attention absent significant individual supervision); <u>Carballo v. Apfel</u>, 34 F. Supp. 2d 208, 220 (S.D.N.Y. 1999) (rejecting ALJ finding of less than moderate limitation in concentration domain where the record "is notable for its many, striking, and unanimous references to the difficulties [the claimant] experiences in this domain," including the need for constant support, repetition and redirection). <u>Cf.</u> <u>Bridges v. Massanari</u>, No. Civ. A. 00-2639, 2001 WL 883218 (E.D. La. July 30, 2001) (finding less than marked limitation where claimant responded to direction and authority in a more structured environment and "could easily be redirected to work, completed class work timely and adequately, and could sustain an ordinary daily routine <u>without supervision</u>.") (emphasis added). In this cause, not only did the counselors observe A.S.W.'s failure to maintain focus during his day-to-day activities, such as during dinner, while performing chores, and at bedtime (<u>e.g.</u>, Tr. 485, 529, 536, 552, 574, 579, 653, 703, 715, 720, 722), but a review of the reports in their entirety shows A.S.W.'s continued and declining ability to maintain focus on his homework, as demonstrated by his repeated failure to start homework assignments and complete them. (<u>E.g.</u>, Tr. 430, 436, 440, 442, 444, 453, 454,

462, 471, 474, 485, 492, 507, 517, 521, 525, 557, 572, 585, 587, 589, 592, 597, 599, 600, 607, 608, 631, 632, 635, 637, 638, 639, 651.)  Indeed, by the time A.S.W. was discharged from Cottonwood, he was completing only 40% of his homework, having dropped in his completion rate continually since being admitted to Cottonwood. (Tr. 365-73.)  In his determination that A.S.W. had less than marked limitations in this domain, the ALJ did not acknowledge these extensive, consistent and recent observations.

Although the ALJ included brief summaries of A.S.W.'s treatment at Cottonwood and Mr. Leonard's report in his general recitation of the evidence of record, he nevertheless selectively relied on only that evidence from Ms. Bauman in assessing A.S.W.'s limitations in the domain of Attending and Completing Tasks without explaining the basis for disregarding or discounting the extensive and contradictory evidence from Cottonwood.  Nor did the ALJ provide any reason to discount the opinion of Mr. Leonard, A.S.W.'s longtime counselor of four years.  With such limited discussion in finding A.S.W. to have less than marked limitations in this domain despite extensive evidence demonstrating otherwise, and no explanation given as to why certain evidence was relied upon and other evidence seemingly rejected, the Court is left to speculate whether or why the ALJ rejected certain evidence.  This the Court cannot do.  Jones, 65 F.3d at 104; Taylor, 333 F. Supp. 2d at 857. Remand is thus necessary "to fill [the] void in the record."

Jones, 65 F.3d at 104; see also Savino-Nixon v. Astrue, 479 F. Supp. 2d 1176, 1183 (D. Kan. 2007).

C.  *Caring for Yourself*

For this domain, the Commissioner is to consider how well the child maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area.  20 C.F.R. § 416.926a(k). Limited functioning can be shown in this domain by engaging in self-injurious behavior, such as suicidal thoughts or actions, self-inflicted injury, or refusal to take medication; or by ignoring safety rules.  20 C.F.R. § 416.926a(k)(3)(iv); Garrett, 366 F.3d at 652.

The ALJ in this case found A.S.W. to have less than marked limitations in this domain.  (Tr. 18.)  The ALJ, however, failed to provide any explanation or analysis, abbreviated or otherwise, to support this conclusion.[29]  For the following reasons, this constituted error.

Earlier in his opinion, the ALJ summarized the evidence of record but did not address the multiple and longitudinal reports of A.S.W. having engaged in self-injurious behavior, including

---

[29]The ALJ's entire remarks in this domain are as follows:  "I find the claimant has less than marked limitation [sic] in this domain."  (Tr. 18.)

banging his head against walls, chest-banging, and punching holes in walls. Indeed, in December 2004, A.S.W.'s caseworker at Community Counseling Center reported that A.S.W. had engaged in self-injurious behavior within the previous seven to ten months. The caseworker also reported that within that same period, A.S.W. was refusing to take his medications. This report, however, was not mentioned by the ALJ in his opinion. The ALJ also failed to note the evidence of record which demonstrated A.S.W. to have had thoughts of suicide or that A.S.W. considered himself to have attempted suicide by threatening to drop heavy furniture on his head. The failure to address and/or discuss such significant evidence which falls squarely within that which must be considered in the domain of Caring for Yourself is error. Without <u>any</u> discussion or analysis of this evidence of record, including whether such evidence supports, detracts from or leads to the assessment made by the ALJ in this domain, this Court is left to weigh the evidence itself, evaluate the relative weight to be accorded the opinions, and resolve any inconsistencies and ambiguities to see if it could reach the same decision as the ALJ. <u>Savino-Nixon</u>, 479 F. Supp. 2d at 1183 ("The ALJ did not 'connect the dots, so to speak,' between the evidence . . . and the conclusion he reached."). This the Court cannot do. <u>Taylor</u>, 333 F. Supp. 2d at 857. Nor is it the role of the Court to search the record for factual bases to support the ALJ's decision. <u>Id.</u> In

light of the record, the ALJ's failure to acknowledge certain evidence, and his failure to explain his reliance on any evidence in reaching his conclusion in this domain, the Court cannot conclude that substantial evidence supports this decision. <u>Id.</u> Accordingly, remand is required for the Commissioner to properly explain his decision. <u>Savino-Nixon</u>, 479 F. Supp. 2d at 1185.

D.    *Health and Physical Well-Being*

In this domain, the Commissioner is to consider "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [the child's] functioning that [was] not consider[ed] in" the domain of Moving About and Manipulating Objects.[30]  20 C.F.R. § 416.926a(l).  The Regulations also require the Commissioner to consider the extent to which medications taken for mental impairments may have physical effects on the child-claimant.  20 C.F.R. § 416.926a(l)(2).

The ALJ in this case found A.S.W. to have no limitations in this domain, noting specifically that A.S.W. had "a history of emergency room visits for colds and accidents as well as migraine type headaches which were treated with medication.  No neurological deficits have been discovered on consultative evaluation. *Claimant's mental impairments are functionally assessed in other*

---

[30]In the domain of Moving About and Manipulating Objects, the ALJ found A.S.W. not to have any limitations:  "There is no evidence of any physical limitations in this arena.  No records or testimony indicate any mobility deficit."  (Tr. 17.)  Plaintiff does not challenge this finding.

*domains*." (Tr. 18.) (Emphasis added.) Plaintiff contends that the ALJ's determination not to consider A.S.W.'s mental impairments in this domain of Health and Physical Well-Being constituted error. Plaintiff's argument is well taken.

"[A]ny given impairment may have effects in more than one domain; therefore, [the Commissioner] will evaluate the limitations from your impairment(s) in any affected domain." 20 C.F.R. § 416.926a(c). It is not appropriate, or permissible, under the Regulations to "collapse" criteria or categories for the functional equivalence analysis; that is, the ALJ cannot disregard evidence of functional impairment in one domain under the rationale that the same evidence was already credited toward an assessment in another domain. See Quinones v. Chater, 117 F.3d 29, 35 (2d Cir. 1997) (finding error in district court's disregard of lack of concentration evidence for concentration, persistence, and pace domain because it had already considered that evidence in finding marked limitation in other area). This is precisely what the ALJ did here.

As noted above, in the domain of Health and Physical Well-Being, the Regulations require the Commissioner to consider the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on the child's functioning as well as the extent to which medications taken for mental impairments may have physical effects on the child. The

explicit failure of the ALJ here to consider any such evidence in this domain given that A.S.W.'s "mental impairments [were] functionally assessed in other domains" is contrary to the letter of the Regulations and constitutes error.  On remand, the ALJ must consider the extent to which A.S.W.'s mental impairments, associated treatment, and medications taken therefor physically affect A.S.W. such that A.S.W. may be functionally limited in the domain of Health and Physical Well-Being.

E.  *Conclusion*

As explained above, it is difficult for this Court to identify a proper basis for the ALJ's finding in this cause.  Although the decision includes the ALJ's synopsis of the evidence in the case, there is no concerted attempt to address the evidence as it pertains to each of the six domains of functioning.  Instead, after summarizing the case file, the ALJ makes conclusory findings with respect to each of the functional domains.  As such, without any meaningful discussion, the Court is unable to determine whether the ALJ properly considered A.S.W.'s various limitations in the proper domains.

The undersigned notes that the ALJ determined to accord great weight to and appeared to base his findings on the opinion of the state agency psychiatrist who "made findings consistent with the above assessment regarding the claimant's functioning in the six domains evaluated."  (Tr. 18.)  The Regulations emphasize,

however, that relatively *lesser* weight should be given to one-time evaluations performed away from the child-claimant's usual settings and routines.  See 20 C.F.R. § 416.924a(b)(6).

> Children may function differently in unfamiliar or one-to-one settings than they do in their usual settings at home [or] at school . . . you may appear more or less impaired on a single examination (such as a consultative examination) than indicated by the information covering a longer period. . . . We will look at your performance in a special situation and at your typical day-to-day functioning in routine situations. We will not draw inferences about your functioning in other situations based only on how you function in a one-to-one, new, or unusual situation.

Id.

According great weight to the opinion of this one-time consulting psychiatrist was error, especially in the absence of any rationale discounting the opinions and observations made by those with a longitudinal history of working with and attempting to treat A.S.W.'s multiple impairments.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this cause be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **March**

**10, 2008.**  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_____
UNITED STATES MAGISTRATE JUDGE



Dated this _27th_ day of February, 2008.